[No. 7720.   Decided June 5, 1909.]

## MARY M. CAMPBELL, *Respondent*, v. ORDER OF WASHINGTON, *Appellant*.[1]

CORPORATIONS—PROCESS—ACTIONS—VENUE—FOREIGN CORPORATION. Laws 1901, p. 356, § 6, requiring beneficial associations to appoint the state insurance commissioner, at Olympia, their statutory agent upon whom service of process may be made, does not require that actions against them be commenced in Thurston county, when such an association has no office or agent in the state for conducting its general business; Bal. Code, § 4854, requiring actions against a corporation to be commenced in the county where it has an office or any person resides upon whom process may be served, not applying in such a case.

INSURANCE—BENEFICIARY SOCIETIES — RECEIPT OF PREMIUMS—ESTOPPEL. A beneficiary association, cannot, after death of the insured, allege that it had no authority to issue a certificate guaranteeing a policy of another association which had been merged by it, where it had received and receipted for the premiums paid thereon.

APPEAL—PLEADINGS—AMENDMENT—INSURANCE. An answer in an action on a beneficiary certificate will be deemed amended to conform to proof received without objection as to a nonliability clause not pleaded in full.

INSURANCE—BENEFICIARY CERTIFICATE—NONLIABILITY CLAUSE—"INVOLUNTARY" SUICIDE—CONSTRUCTION—INSTRUCTIONS TO JURY. In an action upon a beneficiary certificate containing a nonliability clause in case the deceased member die "by his own hands whether sane or insane at the time, whether the act be voluntary or involuntary," there is no liability in case of an involuntary suicide; and it is error to instruct the jury to find for the plaintiff if they find the deceased did not commit suicide, which means to "intentionally do some act to intentionally cause his death" (CHADWICK, J., dissenting).

[1]Reported in 102 Pac. 410.

SAME—TRIAL—INSTRUCTIONS—ISSUES NOT SUBMITTED. In an action upon a beneficiary certificate, in which there are issues as to the plaintiff's exhausting her right of appeal in the society, it is error to instruct the jury to bring in a verdict for the plaintiff if they find in her favor upon the defense of suicide.

PRINCIPAL AND AGENT—AUTHORITY. Agency may be created by conduct; and upon the receipt of proof by letters and conversations, it is a question for the jury whether an agent acted within the real or apparent scope of his authority.

APPEAL—DISMISSAL—BRIEFS—FILING. An appeal will not be dismissed because the briefs are filed one day too late.

Appeal from a judgment of the superior court for Snohomish county, Black, J., entered January 27, 1908, upon the verdict of a jury rendered in favor of the plaintiff, in an action upon a beneficiary certificate. Reversed.

*H. W. Lueders* (*Jos. D. Coleman,* of counsel), for appellant.

*Geo. D. Emery,* for respondent.

Gose, J.—The respondent was the plaintiff below. On the 28th day of February, 1905, the respondent and her husband, Alexander C. Campbell, became members of a fraternal organization known as the Independent Order of Lions, and on that day it issued to them a joint beneficiary certificate of membership, whereby and by its constitution and laws it promised to pay to the survivor, upon the death of either, the sum of $50 as a funeral benefit, and $25 per month for four years until the sum of $1,250 had been paid, upon their compliance with the constitution, laws, by-laws, and regulations of the order. Thereafter the Order of Lions merged its membership with the Order of Washington, the appellant, a like fraternal organization; and on the 8th day of June, 1905, the appellant issued to them its written certificate of guaranty in the following terms:

GUARANTY CERTIFICATE No. 11308.
INDEPENDENT ORDER OF LIONS.

Certificate No. 6,535, issued by the Order of Washington.

In consideration of, and upon the warranties and statements made by, Alexander C. and Mary M. Campbell in application and

medical examination to the Independent Order of Lions, a society which has merged its membership with the Order of Washington, to whom was issued certificate No. 6,535, in the sum of $1,250, and upon the payment of all dues and assessments as provided for in the constitution and laws of the Independent Order of Lions, and in compliance with all laws, rules, and regulations now in force and all amendments, changes, or additions thereto which may hereafter be adopted by the governing body of the Order of Washington, said society herein binds itself to pay the beneficiary or beneficiaries named in the within certificate, the benefits as provided for under the terms of said certificate; provided that the said member shall continue to faithfully pay all dues and assessments the same as before such certificate was accepted by the Order of Washington, and compliance with the laws of said Order of Washington as herein agreed. This slip to be attached to and become a part of certificate No. 6,535 formerly issued by the Independent Order of Lions to said member on the 28th day of February, 1905, and now indorsed and rewritten by the Order of Washington by this certificate No. 11,308 of the issue of the Order of Washington.

The Order of Washington,
(Seal)                           By W. W. Terry, Supreme President.
By J. L. Mitchell, Supreme Secretary.

Dated at Portland, Oregon, this 8th day of June, 1905.

The respondent and her husband thereupon became members of the appellant order, and in May 31, 1906, paid to it their dues for the month of May of that year. On the 4th day of June, 1906, the said Alexander C. Campbell died. Proof of such death was thereupon submitted to the appellant, and after some negotiations and the failure of the appellant to make payment, this suit was instituted, resulting in a verdict and judgment in favor of the respondent. From such judgment, this appeal is taken.

The pleadings are lengthy, and many errors are assigned. With the view we take of the case, it will not be necessary to consider all the assignments, nor will we consider them in the order in which they have been presented.

The complaint alleges that the appellant is a fraternal beneficiary association, incorporated, organized, and doing business under the laws of the state of Oregon. This suit was instituted and tried in Snohomish county in this state. A demurrer was interposed to the complaint, which was over-

ruled; whereupon the appellant appeared generally and moved for a change of venue, which was denied. It is now urged that, in view of the fact that the appellant was a foreign corporation, the trial court was without jurisdiction. We have held adversely to this contention. *Butler v. Supreme Court of Foresters*, 48 Wash. 147, 92 Pac. 66.

The further objection is urged against the complaint that it does not show that the appellant had authority to make the contract upon which a recovery was had. As we have said, the respondent and her husband became members of the Order of Washington, and paid their dues to it for the month of May, 1906. The appellant gave them its receipt, upon which is printed the name of the appellant, and which recites that its union No. 91 received from them local dues for the month of May, 1906. Prior to the issuance to them of the guaranty certificate, their membership had been in Whatcom Lodge, No. 47, of Bellingham, of the Independent Order of Lions. Upon the plainest principles of justice, the appellant cannot now be heard to urge this question.

A reading of the certificate given by the appellant discloses that its liability is predicated upon two conditions; (1) that the beneficiaries shall pay their dues and assessments as provided in the constitution and laws of the Order of Lions, and (2) that they shall comply with all laws, rules, and regulations of the Order of Washington. The evidence discloses that the constitution and laws of the appellant, at the time it issued such certificate, contained the following provisions:

"The death of a member by his own hands, whether sane or insane at the time, whether the act be voluntary or involuntary, . . . is a risk not assumed by this Order.

"No action, suit or proceeding shall be brought or commenced in any court, by or on behalf of any beneficiary, under any life benefit certificate of the order, until the complainant or complainants shall have exhausted all remedies within the order, first appealing from the subordinate union to the su-

26—53 WASH.

preme executive board, and from the decision of the supreme board to the supreme union.

"Any person claiming any right or privilege under any life benefit certificate issued by the order, being dissatisfied with any decision of the supreme executive board in relation thereto, may appeal to the supreme union."

One of the defenses interposed was that the deceased died by his own hand, it being alleged that he committed suicide by taking carbolic acid. Whilst the appellant did not plead the clause quoted in full, its entire constitution and laws were received in evidence by consent, and the pleadings will therefore be treated as amended so as to present the entire defense available under the nonliability clause. This defense was the pivotal question in the case. The undisputed evidence showed that the deceased died suddenly from carbolic acid poisoning. The jury returned a special verdict, to the effect that he did not commit suicide. Touching the question of suicide, the court instructed:

"Gentlemen of the jury. I have decided to eliminate practically from your consideration every question except substantially two questions which I shall submit to you. The first is whether the deceased, Alexander Campbell, committed suicide or not. If you decide from the evidence in this case that he did not commit suicide, you need not proceed any further. If you say that he did not commit suicide, then you shall immediately render a verdict in favor of the plaintiff, the form of which I will give you. . . . To commit suicide means that one shall intentionally do some act to intentionally cause his death."

The giving of these instructions is assigned as error. Webster defines "involuntary" as signifying "contrary to one's will or wishes." Speaking to this question, in *Supreme Council of the Royal Arcanum v. Pels*, 110 Ill. App. 409, at page 411, it is said:

"Under a by-law providing that the certificate should be void if the insured 'whether sane or insane die by his own hand,' any self-destruction is excepted, and there is complete exemption from liability in case of suicide by the insured, not-

withstanding he was wholly insane and incapable of under-
standing the physical nature and effect of his act.   .   .   .
Long before Pels became a member of the Royal Arcanum, it
had been settled by a long course of judicial decisions in this
and other states that the phrases 'commit suicide,' 'die by
his own hand,' 'take his own life,' and their equivalents, did
not mean or include, when used in a life insurance policy or
in the by-law of a benefit society, the taking of the life of the
insured by his own hand, if he was at the time insane."

In *Grand Legion of Select Knights, A. O. U. W. v. Korne-
man,* 10 Kan. App. 577, 63 Pac. 292, 293, the court say:

" 'Die by his own hand,' 'die by suicide,' and 'commit sui-
cide' are synonymous with 'voluntary suicide.' "

Again, in the same opinion, quoting from *Bigelow v. Berk-
shire Life Ins. Co.,* 93 U. S. 284, 23 L. Ed. 918, it is said:

"Nothing can be clearer than that the words 'sane or in-
sane', were introduced for the purpose of excepting from the
operation of the policy any intended self-destruction, whether
the insured was of sound mind or in a state of insanity. These
words have a precise, definite, well-understood meaning.   No
one can be misled by them; nor could an expansion of this
language more clearly express the intention of the parties.
In the popular, as well as the legal, sense, suicide means, as
we have seen, the death of a party by his own voluntary act;
and this condition, based, as it is, on the construction of this
language, informed the holder of the policy, that, if he pur-
posely destroyed his own life, the company would be relieved
from liability."

We have not overlooked the fact that the words under con-
sideration have been construed as not including death by ac-
cident, in *Keels v. Mutual Reserve Fund Life Ass'n,* 29 Fed.
198.   There are numerous other cases which hold that the
words "death by one's own hand whether sane or insane" do
not include death by accident.   However, the word "involun-
tary," has a well understood, general meaning which accords
with the definition quoted.   We have before us a contract for
construction, and the question is *res nova* in this court.   We
cannot escape the conclusion that the words have a broader

meaning than intentional suicide. In the *Keels* case the court said: "If it were intended by this policy to include death by accident, it was easy enough to say so." Webster defines an accident as "that which happens without any one's direct intention; unintentional." We have noticed that the words "death by one's own hand," have been held to mean "voluntary suicide." This is the almost uniform meaning which the courts have ascribed to these words. We think we must assume that the words "sane or insane," and "voluntary or involuntary" were placed in the policy to accomplish a purpose. To say that they signify nothing more than an intentional self-killing, is to deny them a part of their well known meaning. The courts in thus limiting them have said, *arguendo*, that they are the words chosen by the insurance companies, and that if they were intended to exempt the insurer from the obligation arising from death by accident, other words should have been chosen.

But we have not, then, passed the starting point. The question is, Are not the words apt, and do they not mean precisely what they say and what they are commonly understood to include? We cannot yield our assent to deny to those words their plain, ordinary, precise, and definite meaning in order that an unfortunate party may be brought within the terms of a harsh contract. In *Penfold v. Universal Life Ins. Co.*, 85 N. Y. 317, the court was considering a policy which exempted the insurer from liability if the insured should "die by his own hand or act, voluntary or otherwise." At page 322, the court say:

"The words 'voluntary or otherwise' preclude the parties claiming under the policy, if the act was one of suicide, from setting up the condition of mind of the party committing it, and contending that it was an involuntary act of suicide."

The state of mind of the assured is provided for in the instant case by the words "sane or insane." *Bigelow v. Berkshire Life Ins. Co., supra.* Hence, we must conclude either that the words "voluntary or involuntary" shall be given their

plain, ordinary meaning, or that they shall be cast off as surplusage. If the words "death by one's own hand," are synonymous with "voluntary suicide," as the courts have almost uniformly held, and the state of mind has been covered by the use of the words "sane or insane," may we not conclude that the words under consideration exempt the appellant from liability in case of involuntary suicide, from causes other than those proceeding from the act of an insane mind? We cannot approve the instruction without construing out of the words some of the vigor which the parties have placed in their contract.

The jury should have been instructed that, if the deceased came to his death by his own hand, whether sane or insane, at the time, whether the act producing death was voluntary or involuntary, there could not be a recovery. We do not commit ourselves to the doctrine that such a clause would exempt the insurer from liability in every case where death occurs from accident; but limited to the particular case, we have no difficulty in arriving at the conclusion that the instructions quoted were not a correct statement of the law. The case was seemingly tried by the court on the theory that the contract was governed by the laws of the Order of Lions, and by the appellant's counsel on the theory that it was governed by the laws of both orders. We have seen that the dues were to be paid according to the terms of the original contract, and that the liability in other respects was to be measured by the laws of the appellant.

The instructions quoted were erroneous upon another ground: They assume that, if the deceased did not commit suicide, the verdict should be for the respondent. We have seen that there are questions in the case such as exhausting the right of appeal according to the laws of the order which we have quoted. It is urged by the respondent that this question, together with the question of the cause of death, was waived by the appellant. These were questions of mixed law and fact, and were not submitted to the jury.

It is also urged that the court erred in permitting the witness Emery to testify as to his conversation with Dr. Tilzer, and in admitting in evidence the correspondence between the respondent's counsel and the appellant. The evidence of the witness Emery is that he talked to the doctor concerning the case at the head office of the appellant; that the doctor was in possession of the proof papers in this case. The letters admitted in evidence were from the appellant to the respondent's attorneys, written in answer to their inquiries about the case. The correspondence, as well as the parol testimony of the witness, was properly submitted to the jury. It is fundamental that agency may be created by conduct or by written or spoken words. It was a question for the jury to determine whether persons assuming to speak for the appellant were, considering all the attendant circumstances, acting within the real or apparent scope of their authority.

Other questions are urged, but in view of the fact that they will probably not arise upon a retrial, we will not consider them. We have not overlooked the respondent's motion to dismiss the appeal on the ground that the appellant's briefs were filed one day too late. The motion will be denied.

The case will be reversed, with directions to the trial court to permit the pleadings to be recast so as to state the issues according to this opinion.

RUDKIN, C. J., FULLERTON, DUNBAR, CROW, and MOUNT, JJ., concur.

CHADWICK, J. (dissenting)—It seems to me that there is more in this case than a technical definition of the words quoted and defined in the majority opinion. All contracts of the character assumed by the appellant and its predecessor in interest should be construed by reference to the principal undertaking. The Order of Lions issued a policy on the life of Alexander C. Campbell. No doubt he entered into the contract believing that his life was insured against death from any disease or casualty. To hold that an insurance company

or beneficiary society can enter into a principal engagement to pay a certain sum in the event of death, and then so limit its undertaking by fine print provisos as to eliminate the .possibility of recovery in case of accidental death, in my opinion does violence to the first principles of justice, and is contrary to well settled rules of jurisprudence, as declared by the courts in construing insurance policies, bills of lading, etc. The policy is unilateral and was evidently drawn with intent to mislead the assured, for certainly no reasonable man would knowingly subscribe to a contract so unfair, so. unjust, and so clearly set as a snare for the unwary.

Further, the condition relied upon is not, in fact, the contract that was made between the parties. That was a simple contract to insure the life of the assured. A policy which should evidence that contract is now set up, in part at least, to defeat the claim. No reasonable minds could ever meet on the condition relied upon to sustain the defense in this case. The association took it upon itself to furnish the written evidence of the contract, and in doing so it switched the true contract, to which it had a right to attach reasonable conditions, to a sure-thing contract to be construed in accord with the real agreement only so long as the assured lived and paid his dues—a contract which the association assumed would never be read by the assured. Such contracts seldom are read. The party usually relies upon the well-spoken words of the agent. The added condition of the policy should not be held binding unless it appears that it was called to the attention of the assured and assented to. This is within the rule declared by this court in *Cole v. Union Cent. Life Ins. Co.*, 22 Wash. 26, 60 Pac. 68, 47 L. R. A. 201, and *Foster v. Pioneer Mut. Ins. Ass'n.*, 37 Wash. 288, 79 Pac. 798. This doctrine is sustained on the theory that the application for the insurance is not merged in the policy, but is still vital to show the real agreement of the parties, and equally available to either in the event of a contest.

Notwithstanding the declaration of the majority that it is

not committed "to the doctrine that such a clause would exempt the insurer from liability in every case where death occurs from accident," I submit that the only way to beat out the policy upon which this action is based would be to die of an illness so lingering as to become a matter of common notoriety, or to succumb to the ravages of doddering old age. The case of *Keels v. Mutual Reserve Fund Life Ass'n.*, 29 Fed. 198, is on all fours with this case, and should have been followed.   For these reasons, I dissent.